**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Daniel S. Guerra (State Bar No. 267559)
Joshua B. Glatt (State Bar No. 354064)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
        dguerra@bursor.com
        jglatt@bursor.com

*Attorneys for Plaintiff and the Putative Classes*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EMMA IVEY, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>INSTRUCTURE HOLDINGS INC.,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff Emma Ivey ("Plaintiff") brings this action individually and on behalf of all others similarly situated against Defendant Instructure Holdings, Inc. ("Canvas" or "Defendant"). Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself, which are based on personal knowledge.

**NATURE OF THE ACTION**

1.      Plaintiff brings this class action lawsuit on behalf of all students who attend public universities that used the Canvas LMS, a web-based learning software used for scheduling, managing assignments, classes, grades, communications, file storage, and other school-related activities.

2.      Plaintiff seeks to hold Defendant responsible for the injuries Defendant inflicted on Plaintiff and thousands of similarly situated students across the country ("Class Members") due to Defendant's impermissibly inadequate data security, which caused the theft of their personally identifying information ("PII") such as the names, e-mail addresses, student messages with professors and administrators, student identification numbers, and grades (the "Data Breach" or "Breach").  Initial knowledge of the Breach was made public on or around May 1, 2026.[1]

**JURISDICTION AND VENUE**

3.      This Court has personal jurisdiction over Defendant because intentionally availed itself of this jurisdiction by marketing, providing services in, and engaging in significant activities through its Canvas platform at numerous schools in the district which were also impacted by the Data Breach.

4.      This Court has subject matter and diversity jurisdiction over this Action under 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this is a class action wherein the amount in controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed Classes, and at least one Class Member is a citizen of a state different from Defendant.

---

[1] Deeba Ahmed, *ShinyHunters' Instructure Canvas LMS and Vimeo Breaches Impact Millions of Users,* available https://hackread.com/shinyhunters-instructure-canvas-lms-vimeo-data-breach/.

5. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial portion of the events giving rise to Plaintiff's claims occurred in this District.

## THE PARTIES

6. Plaintiff Emma Ivey is a natural person and citizen of California who resides in Monterey, California. Plaintiff Ivey is a student at California State University, Monterey Bay ("CSUMB"), a public state university within the California State University System. CSUMB uses Canvas LMS as its student management system, including for posting grades, receiving assignment submissions from students, and communicating with students. Accordingly, Plaintiff Ivey is one of thousands of students who has communicated with CSUMB professors and faculty, submitted assignments, received and hosted grades, and has her student ID on Canvas LMS. CSUMB's Canvas platform was hacked in the relevant breaches at issue in this action.

7. Plaintiff Ivey, like all Class Members, uses Canvas to communicate with her professors about grades and assignments, submit assignments, access course materials, store her personal and academic calendar entries, communicate with classmates, and more.

8. Defendant Instructure Holdings, Inc. is a Delaware corporation with its principal place of business in Salt Lake City, Utah. Defendant owns, operates, develops, and maintains the Canvas LMS system.

## FACTUAL ALLEGATIONS

A. **Background On Data Breaches**

9. A data breach is an incident in which sensitive, protected, or confidential data has potentially been viewed, stolen, or used by an individual unauthorized to do so.[2]

10. Data breaches are becoming increasingly more common and harmful. In 2014, 783 data breaches were reported, with at least 85.61 million total records exposed.[3] In 2019, 3,800 data breaches were reported, with at least 4.1 billion total records exposed.[4] The average cost of a

[2] *See* Juliana de Groot, *The History of Data Breaches*, Fortra (Nov. 12, 2018), https://digitalguardian.com/blog/history-data-breaches.

[3] *See id*.

[4] *See* Dan Rafter, *2019 Data Breaches: 4 Billion Records Breached So Far*, Norton (Aug. 18, 2018), https://us.norton.com/internetsecurity-emerging-threats-2019-data-breaches.html.

data breach in the United States in 2019 was $8.19 million.[5]

11. Consumers are harmed in a variety of ways by data breaches. First, consumers are harmed financially. According to the IBM and Ponemon Institute's 2019 "Cost of a Data Breach" report, the average cost of a data breach per consumer was $150 per record.[6] However, other estimates have placed the costs even higher. The 2013 Norton Report estimated that the average cost per victim of identity theft—a common result of data breaches—was $298 dollars.[7] And in 2019, Javelin Strategy & Research compiled consumer complaints from the U.S. Federal Trade Commission ("FTC") and indicated that the median out-of-pocket cost to consumers for identity theft was $375.[8]

12. Identity theft is one of the most problematic harms resulting from a data breach. With access to an individual's PII, criminals can do more than just empty a victim's bank account – they can also commit all manner of fraud, including obtaining a driver's license or official identification card in the victim's name, but with the thief's picture. In addition, identity thieves may obtain a job, rent a house, or receive medical services in the victim's name. Identity thieves may even give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.[9]

13. Consumers are also harmed by the time they spend rectifying the effects of a data breach. A Presidential identity theft report from 2007 states that:

> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity

---

[5] *See* IBM Security, *Cost of a Data Breach Report* (2019), https://insights.integrity360.com/hubfs/2019-cost-of-a-data-breach-report-04_03025203USEN.pdf.

[6] *See id.*

[7] *See* Norton by Symantec, *2013 Norton Report* (2013), https://www.hearst.com/documents/33329/653025/2013+Norton+Report.pdf/9042fbe0-7640-de50-63b1-a0915ff91f4a?t=1581612867150.

[8] *See* Insurance Information Institute, *Facts + Statistics: Identity Theft and Cybercrime*, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (citing the Javelin report).

[9] *See* U.S. Federal Trade Commission, *Warning Signs of Identity Theft*, https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft.

thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts, open new ones, and dispute charges with individual creditors.[10]

14.    Further, the effects of a data breach on consumers are not temporary.  In a report issued by the U.S. Government Accountability Office ("GAO"), the GAO found that "stolen data may be held for up to a year or more before being used to commit identity theft," and "fraudulent use of [stolen information] may continue for years" after the stolen information is posted on the Internet.[11]  Thus, consumers can lose years' worth of time dealing with a data breach.

15.    The existence of these problems is not always immediately ascertainable.  As the GAO Report describes:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft.  Further, once stolen, data has been sold or posted on the web, fraudulent use of that information may continue for years.  As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

16.    Consumers are also harmed by the lost value of their data.  PII represents important, highly valuable property rights.[12]  PII can be easily commodified, allowing the information to be bought and sold.[13]  This information "has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets."[14]

17.    Thus, when consumers' PII is disclosed without their consent, consumers are deprived of both the ability to choose what is done with their information as well as the full

[10] U.S. Federal Trade Commission, *The President's Identity Theft Task Force, Combating Identity Theft: A Strategic Plan* (Apr. 2007), https://www.ftc.gov/sites/default/files/documents/reports/combating-identity-theft-strategic-plan/strategicplan.pdf.

[11] *Remijas v. Neiman Marcus Group, LLC*, 794 F.3d 688, 694 (7th Cir. 2015) (citing U.S. Gov't Accountability Office, GAO–07–737, Report to Congressional Requesters: Personal Information (2007)).

[12] *See* John T. Soma et al., *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J. L. & Tech. 11, at 3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[13] *See* Robert Lowes, *Stolen EHR [Electronic Health Records] Charts Sell for $50 Each on Black Market*, Medscape (Apr. 28, 2014), https://www.medscape.com/viewarticle/824192.

[14] *See* Soma, *supra*, note 12.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    4

monetary value of their information.

**B.      The Canvas LMS Data Breach**

18.      Canvas LMS is a digital "learning management system" employed by colleges and universities to host student submissions, schedules, class information, grades, and various student information in a single place.[15]  To date, Canvas has more than 30 million users.[16]

19.      On May 1, 2026, Defendant confirmed that "hackers exploited a vulnerability to gain access, forcing the company to shut down parts of its service, including Canvas Data 2 and Canvas Beta. This, in turn, caused problems for schools' third-party integrations and external apps that rely on API keys (digital connectors) to function."[17]

20.      While Defendant initially sought to downplay the initial attack, "ShinyHunters, a group with a string of data theft and extortion campaigns targeting major global companies, said in a May 3 post on its website that it had stolen roughly 6.65 terabytes of Canvas data[18] related to nearly 9,000 schools worldwide that included student names, email addresses and private messages between students, teachers, and other staff."[19]  Moreover, "TechCrunch independently verified a sample of the stolen data, confirming records from at least two U.S. schools (one in Massachusetts, one in Tennessee) containing … phone numbers[.]"[20]

21.      Indeed, Defendant "confirmed names, email addresses, student ID numbers and

---

[15] INSTRUCTURE, *With Canvas, Smart Tech Is Just The Beginning*, https://www.instructure.com/canvas.

[16] A.J. Vicens, *Schools Reach Out to Canvas Hackers As Breach Hits U.S. Classrooms, Source Says*, REUTERS (May 8, 2026) *available* https://www.reuters.com/legal/litigation/schools-reach-out-hackers-canvas-breach-hits-us-classrooms-source-says-2026-05-08/.

[17] Deeba Ahmed, *supra* note 1.

[18] A single terabyte is a massive amount of data.  "To put it in perspective, imagine a basic laptop with a storage capacity of 256GB. A single TB offers about four times that space."  A single terabyte can store approximately 20 million text documents.  *See* Box.com *How Much is 1TB*, available https://www.box.com/resources/how-much-is-1tb.

[19] A.J. Vicens, *supra* note 16.

[20] Sig Murphy, *Prevent This: Someone Just Stole Your Kid's School Records*, Intruvent Edge (May 5, 2026) *available* https://edge.intruvent.com/p/prevent-this-someone-just-stole-your.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                          5

private messages between users had been accessed before the breach was contained."[21]  This totaled "roughly 275 million records tied to students, teachers and staff, and shared a list of 8,809 school districts, universities and online education platforms it claims were affected."[22]

22.    Worryingly, "[t]he sensitivity of Canvas messages compounds the concern. The platform is used by students to disclose medical and mental health information to academic advisers, to request accommodations and to communicate with Title IX advocates."[23]

23.    Defendant "confirmed on a FAQ page that it started an investigation after it first detected unauthorized activity in Canvas on April 29, and took Canvas offline on Thursday [one day later] after the same unauthorized actor 'made changes that appeared when some students and teachers were logged in.'"[24]  Defendant's negligence in not taking immediate action upon the initial compromise of its platform, and allowing it to occur in the first instance, led to the theft of millions of student records.

24.    Then, on May 7, 2026, Defendant *again* "identified additional unauthorized activity tied to the same incident" as April 30.[25]  As Defendant admitted, the second incident occurred in the same manner the first incident did a week earlier.

25.    Frustratingly, this is not the first time Defendant negligently failed to secure the information of students.  "[T]his is Instructure's second confirmed breach in approximately eight months.  In September 2025, the same ShinyHunters group exploited a social engineering attack against the company's Salesforce environment."[26]  And notably, "the Canvas attack is strikingly

---

[21] ABC 10, *Hackers Breach Canvas Learning Platform, Exposing Data on Millions of Students and Teachers*, available https://www.abc10.com/article/news/nation-world/canvas-hack-shinyhunters-schools-students-teachers-data-exposed/507-0f3f5973-3d68-45af-b309-666561b2bd87.

[22] *Id.*

[23] *Id.*

[24] Rachel Treisman, *Canvas is Back Online, But Questions—and Final Exam Disruptions—Linger,* NPR (May 8, 2026) *available* https://www.npr.org/2026/05/08/nx-s1-5815956/canvas-data-breach-school-finals.

[25] Instructure, *What Happened?* https://www.instructure.com/incident_update#INSTstatus.

[26] ABC 10*, supra* note 21.

similar to a breach at PowerSchool, which also offers learning management tools."[27]

26.    Despite having already been the victim of a cyber-attack and witness to another on its competitor, Defendant failed to take reasonable steps when it initially noticed a threat on its system.

27.    Just like the first instance, the second breach was made through Defendant's "Free-for-Teacher service," where the hackers were able to "exploit an issue related" to Defendant's service.[28]

**C.    Defendant's Negligence Put Students at Risk**

28.    With student's PII, including e-mails, names, student IDs and potentially more stolen, they are now at risk of further identity-related harm.

29.    Indeed, as one cyber security expert noted on the attack, "users should stay vigilant, especially for phishing messages — whether it's someone posing as Canvas prompting a password change, or pretending to be a professor sending course materials."[29]

30.    That is precisely what happened.  As one student noted, "Everyone is offline including Instructors and I personally have an Essay worth 25% of my grade, as well as 2 separate Online Exams that just went live, and I can't even access the Syllabus, let alone complete my coursework.  Instead I woke up to half a dozen spam messages/phishing attempts, a call to my Google Voice from an unidentified party, and closure of every online service except enrollment. I took today off explicitly for getting caught up on my assignments."[30]

31.    By obtaining, collecting, and storing the PII of Plaintiff and Class Members, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting the PII from disclosure.  To be sure, Defendant should have been aware

[27] Heather Hollingsworth, *Canvas System Used by Thousands of Schools is Back Online After Cyberattack Created Chaos*, PBS NEWS (May 8, 2026) *available* https://www.pbs.org/newshour/nation/canvas-system-used-by-thousands-of-schools-is-back-online-after-a-cyberattack-created-chaos.

[28] A.J. Vicens, *supra* note 16.

[29] Rachel Treisman, *supra* note 24.

[30] REDDIT, *Hackers Stole Data and Shut Down All Canvas Services Just in Time for Finals*, https://www.reddit.com/r/extremelyinfuriating/comments/1t6s2vc/hackers_stole_data_and_shut_down_all_canvas/.

of the sensitive nature of the information it had as it had already been attacked once and witnessed a competitor become a target.

32.    Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII.  Plaintiff and Class Members provided their PII to Defendant with the reasonable expectation that Defendant would keep their sensitive PII confidential, maintain its system security, use the PII for business purposes only, and only disclose the information to authorized and trusted personnel.

33.    Defendant has a duty to adopt reasonable measures to protect the PII of Plaintiff and Class Members from involuntary disclosure to third parties.  Defendant has a legal duty to keep consumers' PII safe and confidential.  It failed.

34.    The information held by Defendant at the time of the Breach reportedly includes individuals' email addresses, names, student ID numbers, phone numbers, and communications which may contain additional identifying information.

35.    The PII of individuals remains of high value to criminals, as evidenced by the lengths they will go to access it and the purported value they put on it in ransom requests. Universities have contacted the Hackers for information and numerous sources cite dark web pricing for stolen identity credentials.[31]

### D.    Defendant Failed to Comply with FTC Guidelines

33.    The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices.  According to the FTC, the need for data security should be factored into all business decision making.  Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an 'unfair practice' in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

---

[31] Anita George, *Your Personal Data is For Sale on the Dark Web. Here's How Much it Costs*, Digital Trends, https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (Oct. 16, 2019).

34.    In October 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Businesses, which established cybersecurity guidelines for businesses.  The guidelines note that businesses should protect the personal consumer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems.  The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

35.    Importantly, in 2022, the FTC chair Linda M. Khan issued a "[p]olicy Statement on Education Technology," in which she released guidance to education technology companies, ensuring that "children can do their schoolwork without having to surrender to commercial surveillance practices."[32]  "There are early indications that these types of commercial surveillance practices are beginning to invade ed tech, creating the risk that students will be profiled and targeted—and that their sensitive information could be exposed as part of a data breach."[33] Despite these early indications, Defendant did not ensure the students who use its platform were protected. This is especially alarming due to the fact children as young as kindergarten utilize Defendant's Canvas platform.

36.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

---

[32] Lina M. Khan, *Statement of Chair Lina M. Khan Regarding Policy Statement on Education Technology and the Children's Online Privacy Protection Act*, https://www.ftc.gov/legal-library/browse/cases-proceedings/public-statements/statement-chair-lina-m-khan-regarding-policy-statement-education-technology-childrens-online-privacy (May 19, 2022).

[33] *Id.*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    9

37.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA.  Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

38.    As evidenced by the Data Breach, Defendant failed to properly implement basic data security practices and failed to audit, monitor, or ensure the integrity of its vendor's data security practices.  Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

39.    Defendant was at all times fully aware of its obligation to protect the PII of its consumers yet failed to comply with such obligations.  Defendant was also aware of the significant repercussions that would result from its failure to do so.

**E.    Defendant Failed to Comply with Industry Standards**

40.    Despite its alleged commitment to taking reasonable measures to secure sensitive PII, Defendant does not follow industry standard practices in securing PII.

41.    Some industry best practices that should be implemented by education companies dealing with sensitive PII, like Defendant, include but are not limited to: educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi- factor authentication, backing up data, and limiting which employees can access sensitive data.  As evidenced by the Data Breach, Defendant failed to follow some or all of these industry best practices.

42.    Other best cybersecurity practices that are standard in the education industry include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points.  As evidenced by the Data Breach, Defendant failed to follow these cybersecurity best practices.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                   10

43. Moreover, the federal government has acknowledged the importance of student privacy in enacting the Family Education Rights and Privacy Act, 20 U.S.C. § 1232g, 34 CFR Part 99 ("FERPA"), which Defendant is well familiar with as an agent to the educational institutions in which FERPA applies to. Indeed, FERPA aims to protect students' "education records," which FEPRA defines as "those records, files, documents, and other materials which (i) contain information directly related a student; and (ii) are maintained by an educational agency or *institution or by a person acting for such agency or institution*." 20 U.S.C. § 1232g(a)(4)(A).

44. Accordingly, actors in the education industry, like Defendant, are aware of the importance in protecting students' PII and education records. Yet Defendant failed to comply with industry standards in protecting this.

45. Defendant failed to comply with these accepted standards in the education industry, thereby permitting the Data Breach to occur.

**F.     Common Injuries and Experiences of Plaintiff and Class Members**

46. Plaintiff and Class Members are students at universities and colleges that require students use Canvas in the course of their studies.  In doing so, Plaintiff and Class Members were required to provide the Defendant, through their schools, PII including but not limited to, their names, e-mail addresses, phone numbers, and corresponding student IDs associated with their enrollment.  Moreover, grades, assignments, and school-related communications were hosted and transmitted through Canvas.

47. At the time of the data breach, Defendant retained Plaintiff's, and Class Members' PII in its system.

48. Plaintiff would not have entrusted her PII to Defendant had she known of Defendant's lax data security policies.

49. Because of the Data Breach, Defendant inflicted injuries upon Plaintiff and Class Members, including but not limited to, their PII ending up in the possession of criminals, the risk of identity theft, invasion of privacy, and the continued mitigation of the materialized risk of identity theft.

50.    Plaintiff and Class Members entrusted Defendant with their PII.  Plaintiff had the reasonable expectation and understanding that Defendant would take—at minimum—industry standard precautions to protect, maintain, and safeguard that information from unauthorized users or disclosure, and would timely notify them of any data security incidents.  After all, Plaintiff would not have entrusted her PII to any entity that used Defendant's services had she known that Defendant would not take reasonable steps to safeguard confidential student information.

51.    The unencrypted PII of Plaintiff and Class Members will end up for sale on the dark web because that is the *modus operandi* of hackers.  These Hackers are a well-known ransom organization that have already threatened to post the information they stole.[34]  As noted, some samples of the data have already been reviewed by third parties, making it clear that some information has already been posted publicly.  In addition, unencrypted PII may fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiff and Class Members.  Unauthorized individuals can easily access the PII of Plaintiff and Class Members.

52.    The link between a data breach and the risk of identity theft is simple and well established.  Criminals acquire and steal PII to monetize the information.  Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes.

53.    Given the type of targeted attack in this case and sophisticated criminal activity, the type of PII involved, and the volume of data obtained in the Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the PII for identity theft crimes.

---

[34] *See* Rachel Treisman, *supra* note 24 ("The group said Thursday that affected schools can prevent the release of their data by consulting with cyber advisory firms and negotiating settlements through the encrypted chat platform Tox.  'You have till the end of the day by 12 May 2026 before everything is leaked,' the hackers wrote.").

54.    Plaintiff and Class Members suffered actual injury from having their PII compromised in the Data Breach including, but not limited to, (a) damage to and diminution in the value of their PII—a form of property that Defendant obtained from Plaintiff; (b) violation of their privacy rights; (c) the likely theft of their PII; (d) fraudulent activity resulting from the Breach; (e) disruption to their educational experience, including delays in exams, inability to access course materials and their own class materials, and cancellation of classes; and (e) present and continuing injury arising from the increased risk of additional identity theft and fraud.

55.    As a result of the Data Breach, Plaintiff and Class Members also suffered emotional distress because of the release of their PII—which they believed would be protected from unauthorized access and disclosure.  Now, Plaintiffs and Class Members will suffer anxiety about unauthorized parties viewing, selling, and/or using their PII for nefarious purposes like identity theft and fraud.

56.    Plaintiff and Class Members have a continuing interest in ensuring that their PII, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

57.    Defendant's failure to properly notify Plaintiff and members of the proposed Class of the Data Breach exacerbated Plaintiff's and the Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

## CLASS ALLEGATIONS

58.    *Class Definition*: Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 on behalf of the following Class and Subclass of similarly situated individuals:

(a)    *Nationwide Class.*  Plaintiff seeks to represent a class of similarly situated individuals, defined as all persons in the United States whose PII was exposed in Defendant's 2026 Data Breach (the "Class" or "Nationwide Class").

(b)    *California Subclass.*  Plaintiff also seeks to represent a subclass of all California residents whose PII was exposed in Defendant's 2026 Data Breach (the "California Subclass").

59.     Excluded from the Class are: (1) Defendant and its officers, directors, employees, principals, affiliated entities, controlling entities, and other affiliates; (2) the agents, affiliates, legal representatives, heirs, attorneys at law, attorneys in fact, or assignees of such persons or entities described herein; and (3) the Judge(s) assigned to this case and any members of their immediate families.

60.     Plaintiff reserves the right to amend the definition of the Class and Subclass if discovery or further investigation reveals that the Class or Subclass should be expanded or otherwise modified.

61.     *Numerosity.*  Members of the Class and Subclass are so numerous that their individual joinder herein is impracticable.  Members of the Class and Subclass number in the millions.  The precise number of Class Members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class Members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

62.     ***Commonality and Predominance***.  Common questions of law and fact exist as to all Class and Subclass Members and predominate over questions affecting only individual Class and Subclass Members.  Common legal and factual questions include, but are not limited to:

(a)     Whether Defendant knew or should have known that their systems were vulnerable to unauthorized access;

(b)     Whether Defendant failed to take adequate and reasonable measures to ensure their data systems were protected;

(c)     Whether Defendant failed to take available steps to prevent and stop the breach from happening;

(d)     Whether Defendant owed a legal duty to Plaintiff and Class Members to protect their PII;

(e)     Whether Defendant breached any duty to Plaintiff and Class Members by failing to exercise due care in protecting their PII;

(f)     Whether Plaintiff and Class Members are entitled to actual, statutory, or other forms of damages, and/or other form of monetary relief;

(g)     Whether Plaintiff and Class Members are entitled to equitable relief, including, but not limited to, injunctive relief or restitution; and

(h)     Whether Plaintiff and Members of the Class and Subclass are entitled to attorneys' fees and costs.

63. ***Typicality.*** The claims of the named Plaintiff are typical of the claims of the Class and Subclass in that Plaintiff and members of the proposed Class and Subclass were subject to the data breach and had their PII accessed by and/or disclosed to unauthorized third parties.

64. ***Adequacy.*** Plaintiff is an adequate representative of the Class and Subclass because Plaintiff has no interests antagonistic to Class and Subclass Members' interests, Plaintiff has retained counsel with considerable experience and success in prosecuting complex class actions and consumer protection cases, and Plaintiff and the undersigned counsel intend to prosecute this action vigorously. The interests of the Class and Subclass Members will be fairly and adequately protected by Plaintiff and Plaintiff's counsel.

65. ***Declaratory and Injunctive Relief.*** The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Defendant. Such individual actions would create a risk of adjudications that would be dispositive of the interests of other Class members and impair their interests. Defendant has acted and/or refused to act on grounds generally applicable to the Class, making injunctive relief or corresponding declaratory relief appropriate.

66. ***Superiority***. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Each individual Class and Subclass Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues. Thus, the Class and Subclass are readily definable and prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserves judicial

resources, ensures uniformity of decisions, and permits claims to be handled in an orderly and expeditious manner.

67. Defendant has acted or failed to act on grounds generally applicable to the Class and Subclass, thereby making appropriate final injunctive relief with respect to the Class and Subclass as a whole.

68. Without a class action, Defendant will continue a course of action that will result in further damages to Plaintiff and members of the Class and Subclass and will likely retain the benefits of their wrongdoing.

69. Based on the foregoing allegations, Plaintiff's claims for relief include those set forth below.

**COUNT I**
**Negligence and Negligence *Per Se***
**(On Behalf Of The Nationwide Class And California Subclass)**

70. Plaintiff hereby re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

71. Plaintiff brings this claim individually and on behalf of the members of the proposed Nationwide Class and California Subclass against Defendant.

72. Defendant gathered and stored the PII of Plaintiff and Class Members as part of its business of providing a platform for educational services.

73. Plaintiff and Class Members entrusted Defendant with their PII with the understanding that Defendant would safeguard their information.

74. Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

75. By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

76. Defendant had a duty to employ reasonable security measures under Section 5 of the FTCA, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including,

as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

77.    Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the PII.

78.    Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiff and Class Members. That special relationship arose because Plaintiff and the Class Members entrusted Defendant with their confidential PII, a necessary part of being a student at a university or college that contracts with Defendant.

79.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

80.    Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiff or the Class.

81.    Moreover, Defendant had a duty to promptly and adequately notify Plaintiff and the Class of the Data Breach.

82.    Defendant had and continues to have a duty to adequately disclose that the PII of Plaintiff and the Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

83.    Defendant breached its duties, pursuant to the FTCA and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

(a)    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

(b)  Failing to adequately monitor the security of their networks and systems;

(c)  Failing to audit, monitor, or ensure the integrity of its vendor's data security practices;

(d)  Allowing unauthorized access to Class Members' PII; and

(e)  Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

84.  Defendant violated Section 5 of the FTCA by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein.

85.  Plaintiff and Class Members were within the class of persons the FTCA was intended to protect and the type of harm that resulted from the Data Breach was the type of harm it was intended to guard against.

86.  Defendant's violation of Section 5 of the FTCA constitutes negligence *per se*.

87.  The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

88.  A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices and the knowledge that it would be a target because of the industry it operates in and the service is provides.

89.  It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the educational industry, including one previously on Defendant just eight months ago.

90.  Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if the PII were wrongfully disclosed.

91.  Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures.  Defendant knew or should have known of the inherent risks in

collecting and storing the PII of Plaintiff and the Class, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on Defendant's systems.

92. It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

93. Plaintiff and the Class had no ability to protect their PII that was in, and remains in, Defendant's possession.

94. Defendant was in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

95. Defendant's duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

96. But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Class, the PII of Plaintiff and the Class would not have been compromised.

97. There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The PII of Plaintiff and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

98. As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; and (vi) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's

possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

99. As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

100. Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

101. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

102. Defendant's negligent conduct is ongoing, in that it still holds the PII of Plaintiff and Class Members in an unsafe and insecure manner.

103. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT II
### Breach of Implied Contract
**(On Behalf Of The Nationwide Class And California Subclass)**

104. Plaintiff hereby re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

105. Plaintiff brings this claim individually and on behalf of the members of the proposed Nationwide Class and California Subclass against Defendant.

106. Plaintiff and Class Members were required to provide their PII to Defendant as a condition of receiving services from Defendant.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    20

107. Plaintiff and the Class entrusted their PII to Defendant. In so doing, Plaintiff and the Class entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen.

108. In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

109. Implicit in the agreement between Plaintiff and Class Members and the Defendant to provide PII, was the latter's obligation to: (a) take reasonable steps to safeguard that PII, (b) prevent unauthorized disclosures of the PII, (c) reasonably safeguard and protect the PII of Plaintiff and Class Members from unauthorized disclosure or uses, (d) retain the PII only under conditions that kept such information secure and confidential.

110. The mutual understanding and intent of Plaintiff and Class Members on the one hand, and Defendant, on the other, is demonstrated by their conduct and course of dealing.

111. In accepting the PII in the context of private, education-related information, of Plaintiff and Class Members, Defendant understood and agreed that it was required to reasonably safeguard the PII from unauthorized access or disclosure.

112. On information and belief, Defendant further promised to take reasonable measures to comply with industry standards and to make sure that Plaintiff's and Class Members' PII would remain protected.

113. Plaintiff and Class Members would not have entrusted their PII to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

114. Plaintiff and Class Members would not have entrusted their PII to Defendant in the absence of their implied promise to monitor their computer systems and networks to ensure that it adopted reasonable data security measures.

115. Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

116.    Defendant breached the implied contracts it made with Plaintiff and the Class by failing to safeguard and protect their personal information, by failing to delete the information of Plaintiff and the Class once the relationship ended, and by failing to provide accurate notice to them that personal information was compromised as a result of the Data Breach.

117.    As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiff and Class Members sustained damages, as alleged herein, including the loss of the benefit of the bargain.

118.    Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

119.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *inter alia,* (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

(a)    For a determination that this is a proper class action;

(b)    For an order certifying the proposed Nationwide Class and the California Subclass under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the proposed Class and Subclass, and naming Plaintiff's attorneys as Class Counsel to represent the Class and Subclass;

(c)    For an order declaring Defendant's conduct violates the statutes referenced herein;

(d)    For an order finding in favor of Plaintiff and members of the Class and Subclass on all counts asserted herein;

(e)    For actual, compensatory, statutory, and/or punitive damages in amounts to be determined by the Court and/or jury;

(f)    For prejudgment interest on all amounts awarded;

(g)    For an order of restitution and all other forms of equitable monetary relief;

(h)    For injunctive relief as pleaded or as the Court may deem proper;

(i)    For an order awarding Plaintiff and members of the Class and Subclass their reasonable attorneys' fees and reimbursement of litigation expenses and costs of suit; and

(j)    For such other and further relief as the Court may deem proper.

**<u>JURY DEMAND</u>**

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: May 8, 2026                                Respectfully submitted,

**BURSOR & FISHER, P.A.**


By:    _/s/ Daniel S. Guerra_

Daniel S. Guerra (State Bar No. 267559)
L. Timothy Fisher (State Bar No. 191626)
Joshua B. Glatt (State Bar No. 354064)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
        dguerra@bursor.com
        jglatt@bursor.com

*Attorneys for Plaintiff and the Putative Classes*